1

2

3

4                        UNITED STATES DISTRICT COURT

5                       NORTHERN DISTRICT OF CALIFORNIA

6

7   AMERICAN HOME ASSURANCE              Case No.  13-cv-04953-HSG
    COMPANY et al.,

8               Plaintiffs,              **ORDER GRANTING PLAINTIFFS'**
                                         **MOTION FOR SUMMARY JUDGMENT**
9        v.                              **AND DENYING DEFENDANTS'**
                                         **MOTION FOR SUMMARY JUDGMENT**
10  SMG STONE COMPANY, INC. et al.,
                                         Re: Dkt. Nos. 43, 49
11              Defendants.

12

13          Pending before the Court are the parties' cross-motions for summary judgment.  Plaintiffs

14  American Home Assurance Company ("AHA") and Insurance Company of the State of

15  Pennsylvania ("ISOP") seek summary judgment that the insurance policies at issue do not cover

16  the claims by Defendants SMG Stone Co. ("SMG"), J. Colavin & Son, Inc. ("Colavin"), Webcor

17  Construction LP ("Webcor"), and Steadfast Insurance Co. ("Steadfast").  Defendants seek

18  summary judgment that Plaintiffs had a duty to defend the underlying arbitration and litigation

19  proceedings.  For the reasons stated below, Defendants' motion is DENIED, and Plaintiffs'

20  motion is GRANTED.

21  **I.    BACKGROUND**

22          The following facts are undisputed unless stated otherwise.

23       **A.    Underlying Insurance Claim**

24          In October 2007, owner and developer Olympic & Georgia Partners LLC ("Olympic")

25  contracted with Defendant Webcor to construct a 54-story hotel and luxury condominium highrise

26  in downtown Los Angeles (the "Project").  Webcor, in turn, subcontracted with Defendants SMG

27  and Colavin to install stone floor tiles at the Project.  Plaintiffs provided general commercial

28

*United States District Court*
*Northern District of California*

liability insurance to Olympic, Webcor, SMG, and Colavin in connection with the Project.

SMG and Colavin began the floor tile installation work in November 2009.  In early 2010, Olympic discovered fractures in some of the stone floor tiles installed by SMG and Colavin.  A few weeks later, the fractured tiles were removed and replaced.  This remediation process required the removal and replacement of portions of drywall and concrete subfloor installed by other subcontractors.

In a letter dated May 12, 2010, Olympic provided "notice of a claim of fractured stone tile" to AHA and explained:

> The Project is nearing completion and its Owner, [Olympic], was about to close escrow on certain Residences and proceed with the sale of the remainder.  However, the demolition and repair of fractured stone tile will preclude completion and closing of the Residences on schedule, and as a result, Owner will suffer substantial damages, including carrying costs, etc.  Owner desires to mitigate damages by proceeding immediately to investigate and repair.  Time is of the essence.

Dkt. No. 44-3.

In a letter dated July 27, 2011, Defendant Webcor "formally plac[ed] [AHA] on notice of the alleged claims and tender[ed] [its] defense and indemnity (and those of [its] subcontractors) pursuant to the" AHA insurance policy.  Dkt. No. 44-5.  Webcor explained that "the owner[s] of the project invited various parties to attend a presentation regarding alleged construction defects concerning various tiles installed at the project."  *Id.*  Counsel for AHA and ISOP attended the presentation, which described "shrinkage-induced fractures" and "loading-induced fractures" to the tiles.  Dkt. No. 44-7 at 49.  Olympic contended that these fractures were caused by various installation defects, such as "installation over concrete with excessive moisture," "improper substrate preparation," and "improper mortar application."  *See* Dkt. Nos. 44-7 at 63, 44-8 at 76, & 44-9 at 104.  The presentation listed a total of $39,342,201 in projected damages.  *See* Dkt. No. 44-9 at 133-34.

In November 2011, Olympic initiated an arbitration proceeding against Webcor, SMG, and Colavin.  Webcor ultimately paid Olympic $8 million to settle the dispute, $7 million of which was paid by Webcor's insurer, Steadfast.

United States District Court
Northern District of California

2

1    SMG and Colavin subsequently sued Webcor for non-payment for services rendered in

2    connection with the floor tile installation, and Webcor cross-complained.  Webcor alleged that

3    "SMG failed to perform its tile work in a manner that was of good quality and workmanship," and

4    that "[a]s a proximate and legal result of SMG's negligence, the stone tile work at the Project is

5    alleged to be defective and that construction defect has led to resulting and consequential

6    damages."  Dkt. No. 1-2 ¶¶ 14, 20.  Webcor sought damages "[f]or all monies expended or to be

7    expended to repair, replace and remediate SMG's defective work."  *Id.* p.10.  SMG and Colavin

8    tendered claims for defense and indemnity in relation to the lawsuit and the arbitration with

9    Olympic, which Plaintiffs denied.

10   **B.      Insurance Policies**

11   AHA issued a general commercial liability insurance policy to Olympic—and, as modified

12   by endorsement, to Defendants Webcor, SMG, and Colavin—covering the time period of May 25,

13   2009 through May 25, 2010.  *See* Dkt. No. 48-1 ("Policy").  ISOP issued a "Follow Form Excess

14   Liability" policy to Olympic covering the time period of May 25, 2007 through August 25, 2011.

15   *See* Dkt. No. 48-2.

16   The "Insuring Agreement" section of the Policy reads:

17   > We will pay those sums that the insured becomes legally obligated
18   > to pay as damages because of "bodily injury" or "property damage"
     > to which this insurance applies.  We will have the right and duty to
19   > defend the insured against any "suit" seeking those damages.
     > However, we will have no duty to defend the insured against any
20   > "suit" seeking damages for "bodily injury" or "property damage" to
     > which this insurance does not apply.

21   Section I ¶ 1(a).

22   The promised coverage applies to "property damage" only if, in relevant part, the

23   "property damage" is caused by an "occurrence."  *Id.* ¶ 1(b)(1).  "Property damage" is defined as

24   (1) "[p]hysical injury to tangible property, including all resulting loss of use of that property," or

25   (2) "[l]oss of use of tangible property that is not physically injured."  Section V ¶ 17.

26   "Occurrence" is defined as "an accident, including continuous or repeated exposure to

27   substantially the same general harmful conditions."  *Id.* ¶ 13.

28   The Policy contains several exclusions.  Relevant here, Exclusion j excludes certain types

of "property damage" from the Policy's ambit.  Section I ¶ 2(j).  Exclusion j(5), as modified by endorsement, removes from coverage "property damage" to "[t]hat particular part of real property on which you, any insured contractor, or any other contractors or subcontractors working directly or indirectly on behalf of you, any insured contractor or subcontractor, are performing operations, if the 'property damage' arises out of those operations."  *Id.* ¶ 2(j)(5) & Endorsement 81705.

Exclusion j(6), as modified by endorsement, removes from coverage "property damage" to "[t]hat particular part of any property that must be restored, repaired or replaced because 'your work' was incorrectly performed on it."  *Id.* ¶ 2(j)(6) & Endorsement 81705.  "Your work" means "[w]ork or operations performed by you or on your behalf" and "[m]aterials, parts or equipment furnished in connection with such work or operations."  Section V ¶ 22.  There is a further exception to the j(6) exclusion: any "property damage" included in the "products-completed operations hazard" *is* covered by the Policy.  Section I ¶ 2(j).  "Products-completed operations hazard" "[i]ncludes all 'bodily injury' and 'property damage' occurring away from premises you own or rent and arising out of 'your product' or 'your work.'"  Section V ¶ 16.  But excluded from this definition—and therefore potentially excluded from coverage by Exclusion j(6)—is "[w]ork that has not yet been completed or abandoned."  *Id.*  The Policy provides that "your work" is considered complete at the earliest of (1) "[w]hen all of the work called for in your contract has been completed," (2) "[w]hen all of the work to be done at the job site has been completed if your contract calls for work at more than one job site," or (3) "[w]hen that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project."  *Id.*  Furthermore, "[w]ork that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed."  *Id.*

Additionally, exclusion *l*, as modified by endorsement, removes from coverage "'property damage' to that particular part of 'your work' that is defective or actively malfunctions and is included in the 'products-completed operations hazard.'"  Section I ¶ 2(*l*) & Endorsement 75187.  The exclusion applies even "if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor."  *Id.*

United States District Court
Northern District of California

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### C.    This Litigation

On October 24, 2013 Plaintiffs filed the present action seeking a declaration that the insurance policies at issue do not cover Defendants' floor tile fracture claims, and that Plaintiffs had neither a duty to defend nor a duty to indemnify Defendants. Dkt. No. 1. The parties filed cross-motions for summary judgment. Dkt. Nos. 43, 49. A hearing was held on May 21, 2015.

## II.    DISCUSSION

### A.    Legal Standard

Summary judgment is proper where the pleadings and evidence demonstrate "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A material issue of fact is a question a trier of fact must answer to determine the rights of the parties under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party bears "the initial responsibility of informing the district court of the basis for its motion." *Celotex*, 477 U.S. at 323. To satisfy this burden, the moving party must demonstrate that no genuine issue of material fact exists for trial. *Id.* at 322. To survive a motion for summary judgment, the non-moving party must then show that there are genuine factual issues that can only be resolved by the trier of fact. *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736, 738 (9th Cir. 2000). To do so, the non-moving party must present specific facts creating a genuine issue of material fact. Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 324.

The court must review the record as a whole and draw all reasonable inferences in favor of the non-moving party. *Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003). However, unsupported conjecture or conclusory statements are insufficient to defeat summary judgment. *Id.* Moreover, the court is not required "to scour the record in search of a genuine issue of triable fact," *Keenan v. Allen*, 91 F.3d 1275, 1279 (9th Cir. 1996) (citations omitted), but rather may limit its review to the documents submitted for purposes of summary judgment and those parts of the record specifically referenced therein." *Carmen v. San Francisco Unified Sch. Dist.*,

1     237 F.3d 1026, 1030 (9th Cir. 2001).

2          **B.     Plaintiffs Do Not Have A Duty To Indemnify Because The Policy Does Not Cover Defendants' Tile Fracture Claims**

3          As a general matter, under California law, commercial general liability policies like the

4     Policy "are not designed to provide contractors and developers with coverage against claims their

5     work is inferior or defective." *Md. Cas. Co. v. Reeder*, 221 Cal. App. 3d 961, 967 (1990).  The

6     *Reeder* court explained the policy justifications for this rule as follows:

7
8             The risk of replacing and repairing defective materials or poor
              workmanship has generally been considered a commercial risk
9             which is not passed on to the liability insurer.  Rather, liability
              coverage comes into play when the insured's defective materials or
10            work cause injury to property other than the insured's own work or
              products.  As one commentator explained: "This distinction is
11            significant.  Replacement and repair costs are to some degree within
              the control of the insured. . . . If replacement and repair costs were
12            covered, the incentive to exercise care or to make repairs at the least
              possible cost would be lessened since the insurance company would
13            be footing the bill for all scrap."

14    *Id.*  "In short, a liability insurance policy is not designed to serve as a performance bond or

15    warranty of a contractor's product."  *F & H Constr. v. ITT Hartford Ins. Co.*, 118 Cal. App. 4th

16    364, 373 (2004) (internal citations omitted).

17         The Policy covers, in relevant part, "property damage" caused by an "occurrence," subject

18    to a number of specific exclusions.

19         **1.  "Occurrence"**

20         Under California law, an occurrence "is simply an unexpected consequence of an insured's

21    act, even if due to negligence or faulty work."  *Anthem Elecs., Inc. v. Pac. Emp'rs Ins. Co.*, 302

22    F.3d 1049, 1055 (9th Cir. 2002) ("[A]ccidents need not crash or clatter; they need only be

23    unexpected consequences, and they may result even from the insured's own negligence.").

24    Relevant here, "California courts construing similar [commercial general liability] policies have

25    found coverage where the insured was negligent, and in particular where the insured had installed

26    or supplied defective products, so long as the insured did not know it was doing so."  *Id.*

27         The Court finds that the fracturing of the stone floor tiles caused by the Defendant

28    subcontractors' defective installation of those tiles was the result of an "occurrence."  There is no

United States District Court
Northern District of California

1   evidence that SMG or Colavin knew that its tile installation work was defective before the tiles

2   fractured.  The undisputed facts demonstrate that such fracturing was "simply an unexpected

3   consequence" of the defective installation.  The parties do not appear to seriously dispute this

4   point.  Rather, the contested issue is whether the fracturing of the tiles constituted "property

5   damage" within the meaning of the Policy.

6   ### 2.  "Property Damage"

7   The Policy defines "property damage" as (1) "[p]hysical injury to tangible property,

8   including all resulting loss of use of that property," or (2) "[l]oss of use of tangible property that is

9   not physically injured."  Section V ¶ 17.

10  ### i.   Physical Injury to Tangible Property

11  In California, "the prevailing view is that the incorporation of a defective component or

12  product into a larger structure does not constitute property damage unless and until the defective

13  component causes physical injury to tangible property in at least some other part of the system."

14  *F & H*, 118 Cal. App. 4th at 372.  As a result, "property damage is not established by the mere

15  failure of a defective product to perform as intended," "[n]or is it established by economic losses

16  such as the diminution in value of the structure or the cost to repair a defective product or

17  structure."  *Id.* (internal citations omitted).  "California cases consistently hold that coverage does

18  not exist where the only property 'damage' is the defective construction, and damage to *other*

19  property has not occurred."  *Reg'l Steel Corp. v. Liberty Surplus Ins. Corp.*, 226 Cal. App. 4th

20  1377, 1393 (2014).

21  Defendants argue that the fracturing of the floor tiles and the damage to the concrete

22  subfloors and interior walls during the removal and reinstallation process constituted physical

23  injury.  Defendants' argument depends on two logical inferences, neither of which is directly

24  supported by California law.

25  First, for Defendants to prevail, their defective installation work must be considered

26  separate and distinct from the physical manifestation of that defective work—*i.e.*, the fractured

27  floor tiles.  But those California cases that have found coverage under general liability policies for

28  property damage resulting from construction defects involved physical injuries to *other* parts of

United States District Court
Northern District of California

1  the construction project.  For example, in *Reeder*, the California Court of Appeal held that

2  "property damage" occurred where "failure of the roofing system . . . allegedly allowed rain water

3  to damage building structures and the contents of living areas."  221 Cal. App. 3d at 971.

4  Similarly, in *Anthem*, the Ninth Circuit held that the insured's "defective circuit boards clearly

5  caused 'property damage'" where the defective circuit boards were supplied by the insured,

6  incorporated by a manufacturer into scanners that were then sold to customers, and caused

7  malfunction of the larger project (each scanner).  302 F.3d at 1057.  Notably, the Court in *Anthem*

8  based its holding on the "loss of use" prong of the "property damage" definition rather than the

9  "physical injury" prong, even though the Court found that "physical damage to the boards

10  occurred after the product had been placed in use."  *Id.* at 1059.  In other words, the Court did not

11  find that the physical injury to the defective product manufactured by the insured constituted

12  "property damage."

13      The second logical premise necessary to sustain Defendants' argument is that the damages

14  to the subfloor and the drywall constituted physical injury to tangible property independent of the

15  Defendants' defective work.  However, the undisputed facts establish that the damage to the

16  subfloor and the drywall did not result from the defective floor tile installation itself.  Rather, such

17  damage resulted from the *remediation* of the defective floor tile work, and remediation work does

18  not constitute property damage under California law.  *See Regional Steel*, 226 Cal. App. 4th at

19  1384 (denying coverage for repair costs where the repairs were necessitated by the insured's

20  defective construction and incidentally caused damage to other areas of the construction project);

21  *St. Paul Fire & Marine Ins. Co. v. Coss*, 80 Cal. App. 3d 888, 892 (1978) (denying coverage for

22  "engaging architects and contractors to correct the defective work of [the subcontractor], for loss

23  of use of the house, for having to rent a substitute residence, and for attorney's fees incurred in

24  prosecuting their action against [the subcontractor]" where the defective work did not cause any

25  actual physical damage to any parts of the home).

26      In its analysis, the *St. Paul* court approved of the following example originally articulated

27  by the Seventh Circuit:

28

United States District Court
Northern District of California

8

United States District Court
Northern District of California

1
2
3
4

> For example, if an automobile crash results from the failure of its defective tire, the defective component can be said to have caused 'property damage' to the finished product.  If, however, some of the tires purchased by the automobile manufacturer are found to be defective and the manufacturer therefore withdraws its cars from the market, there has not been 'injury to or destruction of tangible property' [within the coverage provisions].

5   80 Cal. App. 3d at 892-93 (quoting *Hamilton Die Cast, Inc. v. U.S. F. & G. Co.*, 508 F.2d 417,

6   419-20 (7th Cir. 1975)) (brackets in original).  Applying this analogy to the facts here, defective

7   installation of the car's tires caused them to spring a leak before the car even left the lot.  The

8   defective tires did not inflict any damage on any other part of the car.  However, repairing the

9   damaged tires entailed the cost of taking apart the axle.  In other words, in this case the only

10  property damage at issue is intimately wrapped up in the defective work performed by SMG and

11  Colavin and the required remediation of that defective work.

12      Defendants further argue that "[t]o now contend that [the Policy] did not cover the work of

13  the insureds is to contend that its policies did not cover the very project the policies were

14  specifically purchased to cover."  Dkt. No. 49 ("Def. Mot.") at 13.  This argument misses the

15  point, as the Policy is limited to the specific types of damage described therein.  It cannot be that

16  any damage occurring to the Project is necessarily covered by the Policy.

17      Here, the stone floor tiles were not defective.  Rather, it was the subcontractors'

18  installation of those tiles that was defective, and it was this defective work that caused the floor

19  tiles to crack.  This case is not like *Regional Steel* or *St. Paul*, where installation defects did not

20  cause any physical damage, and the damage asserted was simply the presence of defective work

21  and the subsequent remedial work to cure such defects.  But neither is this case like *Anthem* or

22  *Reeder*, where the construction defect caused property damage to *other* portions of the project.

23  Though it does not appear that any California authority has directly addressed the fact pattern

24  presented here, the Court finds that the general principles set forth in the case law indicate that the

25  fractured stone tiles did not constitute "physical injury to tangible property" as that phrase is

26  defined by the Policy.

27                  **ii.    Loss of Use**

28      Defendants also contend that its claim satisfies the second prong of the "property damage"

9

United States District Court
Northern District of California

1    definition because the fractured stone tiles caused loss of use of the residences and marketing

2    office in which the tiles fractured.  But no one had actually lived in the constructed property yet—

3    in fact, none of the residences had even been sold.  Unlike *Anthem*, where the scanners

4    malfunctioned after having been sold to customers, the floor tiles were not yet being used by

5    residents.

6          The case law indicates that mere delay in the completion of the Project and sale of the

7    residences does not constitute "loss of use."  The *F & H Construction* court found that this prong

8    of the definition was not satisfied where the contractors did "not seek damages for the rental value

9    (or its equivalent) for the loss of use of the [water facility pumping plant where the construction

10   defect occurred]."  118 Cal. App. 4th at 377.  Similarly, the *Regional Steel* court found that this

11   prong of the definition was not satisfied where "any loss of use was occasioned by the necessity of

12   repairing [the subcontractor's] defective tie hooks, a risk not covered by the CGL policy."  226

13   Cal. App. 4th at 1393.

14                                    *        *        *

15         Based on the principles articulated in cases applying California insurance law, the Court

16   seriously doubts that Defendants' claims for costs arising from the fractured floor tiles constitute

17   "property damage" covered by the Policy.  However, even assuming that the claims are covered as

18   a threshold matter, Exclusions j(5), j(6), and *l* bar coverage.

19                        **3.  Exclusions**

20         An "insurer has the right to limit the coverage of a policy issued by it and when it has done

21   so, the plain language of the limitation must be respected."  *Regional Steel*, 226 Cal. App. 4th at

22   1394 (internal quotation marks and citations omitted).  While "the insured has the burden of

23   proving his or her claim is within the basic scope of coverage," the "burden of proving exclusions

24   to coverage" falls on the insurer.  *Id.*  California law mandates that exclusions be interpreted

25   narrowly and against the insurer.  *MacKinnon v. Truck Ins. Exch.*, 31 Cal. 4th 635, 648 (2003).

26                        **i.  Exclusion j(5)**

27         Exclusions j(5) and j(6) are known as "the faulty workmanship exclusions" and "preclude

28   coverage for deficiencies in the insured's work."  *Clarendon Am. Ins. Co. v. Gen. Sec. Indem. Co.*,

United States District Court
Northern District of California

1    193 Cal. App. 4th 1311, 1324-25 (2011).  These exclusions "eliminate coverage for the cost of

2    repairing the insured's own work, which is considered a business risk of the contractor." *Golden*

3    *Eagle Ins. Co. v. Travelers Cos.*, 103 F.3d 750, 757 (9th Cir. 1996).

4            As modified by endorsement, Exclusion j(5) precludes coverage for "[t]hat particular part

5    of real property on which you, any insured contractor, or any other contractors or subcontractors

6    working directly or indirectly on behalf of you, and any insured contractor or subcontractor, are

7    performing operations, if the 'property damage' arises out of those operations."  Section I ¶ 2(j)(5)

8    & Endorsement 81705.

9            Defendants argue that the j(5) exclusion does not apply to the costs associated with

10   damages to the interior walls and subfloors because those aspects of the construction project were

11   completed when the floor tiles fractured and were not built by SMG or Colavin.  In other words,

12   Defendants argue that the property damage to the subfloor and the walls did not occur on that

13   "particular part of real property" on which they were working.  But any "incidental" costs incurred

14   to repair or replace non-defective work as a result of remediating the defective work are excluded

15   from the coverage of the Policy.  *See Golden Eagle*, 103 F.3d at 757 (concluding that claims were

16   not covered where "[t]he three letters relied on by [the insurer] indicate defective workmanship"

17   and incidental removal and replacement of non-defective floor coverings to repair the damaged

18   concrete floors "cannot create coverage where none exists").  *Roger H. Proulx & Co. v. Crest-*

19   *Liners, Inc.*, 98 Cal. App. 4th 182 (2002), and *McGranahan v. Ins. Corp. of NY*, 544 F. Supp. 2d

20   1052 (E.D. Cal. 2008), cases cited by Defendants, are not to the contrary.  The courts in those

21   cases held that the j(5) exclusion did not apply specifically because the faulty workmanship

22   directly caused damage to *other* parts of the property that were not being worked on by the

23   subcontractor.  *See Proulx*, 98 Cal. App. 4th at 189, 203 (evidence indicated that leaks from an air

24   conditioning tank liner installed by the subcontractor damaged other pumps and valves in the

25   system); *McGranahan*, 544 F. Supp. 2d at 1060 (evidence indicated that a subcontractor's

26   defective installation of drywall caused mold to develop in other areas of the property such as

27   "cabinets, light fixtures, floors, tubs, and ceilings").

28           Defendants also contend that this exclusion does not apply to the damages resulting from

1    the fractured floor tiles themselves because the tiles cracked after, not during, installation, and thus

2    the fracturing did not occur while the subcontractors were "performing operations." However, the

3    plain language of the exclusion does not require such a simultaneous relationship: instead, it

4    excludes any property damage that "arises out of those operations." Furthermore, the notice sent

5    to Plaintiffs indicated that the tile installation work was still ongoing when the fractures were

6    discovered. *See* Dkt. No. 44-3 ("The Project is nearing completion . . . ."). The Court therefore

7    finds that Exclusion j(5) bars coverage.

### ii.    Exclusion j(6)

9         Exclusion j(6), as modified by endorsement, removes from coverage "property damage" to

10   "[t]hat particular part of any property that must be restored, repaired or replaced because 'your

11   work' was incorrectly performed on it." Section I ¶ 2(j)(6) & Endorsement 81705. There is a

12   further exception to the j(6) exclusion: any "property damage" included in the "products-

13   completed operations hazard" *is* covered by the Policy. Section I ¶ 2(j). As put by the California

14   Court of Appeal, the j(6) exclusion "excludes coverage for the physical injury to, or loss of use of,

15   that part of the property that must be replaced because [the insured's] work was performed

16   incorrectly." *Clarendon*, 193 Cal. App. 4th at 1326.

17        Defendants argue that the products-completed operations hazard exception to the exclusion

18   applies, so that the claims are covered. Defendants bear the burden of showing that the

19   "complaint, together with any extrinsic evidence, raises a 'possibility' that the exception to the

20   exclusion applies." *Anthem*, 302 F.3d at 1059. The application of the products-completed

21   operations hazard exception turns on whether the building has been "put to its intended use" so as

22   to be "deemed complete," which is a question of fact. *See N. Am. Capacity Ins. Co. v. Claremont*

23   *Liab. Ins. Co.*, 177 Cal. App. 4th 272, 286 (2009) ("The point at which a job site has been put to

24   its intended use is a question of fact to be determined under the conditions and circumstances of

25   each case.").

26        As Defendants concede, the undisputed facts indicate that, at most, the units were

27   "*available* for their intended use as residences" when the tiles fractured. Def. Mot. at 17

28   (emphasis added). While Defendants argue that the floors were being used "for marketing

United States District Court
Northern District of California

1    purposes and sales as living units," and that the units were built "for sale purposes," the evidence

2    shows that no units had actually been sold—let alone resided in—when the fractures were

3    discovered.  The Court finds that the temporary use of the floors for sales and marketing purposes

4    is not equivalent to the floors' *intended* use as residences.  Therefore, the Defendants' work had

5    not yet been put to its intended use, and Exclusion j(6) bars coverage.

6                                          *        *        *

7         The Court thus finds that Exclusions j(5) and j(6) preclude coverage of Defendants'

8    claims.  However, even if these exclusions did not apply because Defendants' work was

9    "complete" at the time of the tile fractures, exclusion *l* would preclude coverage under the Policy.

10                        **iii.    Exclusion *l***

11        This exclusion precludes coverage for that part of "your work" that "is defective or

12   actively malfunctions," even after the work is complete.  Section I ¶ 2(*l*) & Endorsement 75187.

13   The exclusion applies to the work of subcontractors.  *Id.*

14        Defendants argue that the cracked floor tiles do not fall within the definition of "your

15   work"—and therefore are outside the application of Exclusion *l*—because the tiles were furnished

16   by Olympic, not Webcor, SMG, or Colavin.  In support, Defendants cite to *Pinkerton & Laws, Inc.*

17   *v. Royal Ins. Co. of Am.*, 227 F. Supp. 2d 1348 (N.D. Ga. 2002).  In that opinion, the Northern

18   District of Georgia read an additional requirement into the "your work" definition: that any

19   "materials, parts, or equipment" must be furnished *by the insured*.  *Id.* at 1355-56 ("The items

20   falling within the scope of [the definition of 'your work'] only include the materials, parts, or

21   equipment furnished by [insured] to install the windows, such as caulk, screws, and other

22   necessary items.  This does not include the windows themselves because the windows were

23   manufactured by [another subcontractor] and furnished by the general contractor.").

24        The Court declines to read additional requirements into the definition of "your work"

25   where the plain language of the contract does not support such a reading, and respectfully declines

26   to adopt the reasoning of the *Pinkerton* court.  *See Am. States Ins. Co. v. Powers*, 262 F. Supp. 2d

27   1245, 1253 (D. Kan. 2003) (holding that exclusion *l* precluded coverage of claim for damage

28   resulting from defective building construction where all building materials were purchased for and

United States District Court
Northern District of California

13

1    provided to subcontractor by the owner of the building).

2          Defendants further argue that the floor tiles were not defective, nor did they actively

3    malfunction.  However, Defendants admit that the tiles fractured because they were not installed

4    properly.  The Court finds that the "malfunction" of the tiles, in the form of fracturing, cannot be

5    separated from Defendants' defective tile installation work.  They are one and the same.  *See*

6    *Collett v. Ins. Co. of the West*, 64 Cal. App. 4th 338, 343-44 (1998) (holding that materially

7    similar "work completed exclusion" removed coverage for claim for damages relating to repair

8    and replacement of collapsed retaining wall defectively constructed by insured).

9          Finally, Defendants argue that "[a]ny other construction of the exclusion would essentially

10   eliminate all products and completed operations coverage for the Contractors, one of if not the

11   primary purpose for" obtaining insurance under the Policy.  Def. Mot. at 19.  The Court rejects

12   this argument.  Excluding coverage of Defendants' claims comports with the clear policy

13   articulated by California courts that liability insurance is not meant to cover costs incurred to

14   remediate an insured's defective construction work.

15         **C.     Plaintiffs Did Not Have A Duty To Defend**

16         "An insurer has a very broad duty to defend its insured under California law."  *Anthem*,

17   302 F.3d at 1054.  According to the California Supreme Court, "the insured is entitled to a defense

18   if the underlying complaint alleges the insured's liability for damages potentially covered under

19   the policy, or if the complaint might be amended to give rise to a liability that would be covered

20   under the policy."  *Montrose Chem. Corp. v. Super. Court*, 6 Cal. 4th 287, 299 (1993).  In

21   addition, "[f]acts extrinsic to the complaint also give rise to a duty to defend when they reveal a

22   possibility that the claim may be covered by the policy."  *Anthem*, 302 F.3d at 1054.  "Even if it is

23   ultimately determined no coverage existed, the insurer [refusing to defend] is liable for defense

24   costs if there was any potential of coverage under the policy during pendency of the action."  *Md.*

25   *Cas. Co. v. Nat'l Am. Ins. Co.*, 48 Cal. App. 4th 1822, 1828 (1996) (brackets in original).

26         If the insured establishes potential liability, "the insurer must assume its duty to defend

27   unless and until it can conclusively refute that potential."  *Montrose*, 6 Cal. 4th at 299.  To carry

28   its "heavy burden," "the insurers must show that there is no genuine issue of material fact as to the

14

1    potential for coverage." *Anthem*, 302 F.3d at 1055-56.

2        Because the Court finds that there is no genuine issue of material fact as to the potential for

3    coverage based on the facts available to the insurers at the time they declined to defend the claims

4    at issue, or anytime thereafter, the Court finds that Plaintiffs did not have a duty to defend.

5    **III.    CONCLUSION**

6        For the foregoing reasons, Plaintiffs' motion is GRANTED and Defendants' motion is

7    DENIED.  The clerk shall enter judgment and close the file.  Both parties shall bear their own

8    costs of suit.

9        **IT IS SO ORDERED.**

10   Dated: June 11, 2015

11

12       HAYWOOD S. GILLIAM, JR.
         United States District Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28